Filed 7/8/16  In re E.N. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.N., a Person Coming Under the Juvenile Court Law. | H042890 (Monterey County Super. Ct. No. J47501) |
| MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.A.,<br><br>    Defendant and Appellant. | |

    M.A. is the father of E.N., and appeals the juvenile court's order terminating his parental rights pursuant to Welfare and Institutions Code section 366.26.[1]  On appeal, father asserts that the court erred when it found that the beneficial parent/child relationship exception to adoption pursuant to section 366.26, subdivision (c)(1)(A) did not apply in this case.

---

    [1] All further statutory references are to the Welfare and Institutions Code.

On November 1, 2013, Monterey County Department of Social and Employment Services (Department) filed a juvenile petition regarding E.N., a newborn baby girl. Following her birth, E.N. had a positive toxicology screen for opiates and benzodiazepines. The petition alleged failure to protect, and that Father had threatened to kill the mother at the hospital, and was an "extremely hostile, aggressive, and violent man" with an extensive history of domestic violence. The petition also alleged that Mother was addicted to pain-killers, suffered from bipolar disorder and had overdosed on prescription medications on two previous occasions.

E.N. was detained on November 4, 2013 and the court ordered that both parents undergo psychological evaluations. Dr. Elizabeth Lee interviewed Father on November 18, 2013. According to Veterans Administration records, Father had developed post-traumatic stress disorder (PTSD) from being in combat during a four-month tour in Afganistan as part of a four-year stint in the army. He told Dr. Lee that he had intrusive memories, difficulty sleeping, and nightmares. He said he had received intermittent services from the Veterans Administration since 2011. Father had been convicted of felony battery against his first wife in 2004 and spent two and a half months in jail. He attended a 52-week domestic violence class and was on probation for three years. Father was arrested in 2013 for spousal battery, and the charges were dropped by the district attorney's office. He denied any recent incidents of domestic violence, but acknowledged that he had a problem with anger management and self-control. Father was tearful when he discussed the fact that he could not see his daughter. He felt that the stress of worrying about his wife's substance abuse while pregnant helped to trigger his PTSD symptoms.

At the jurisdictional hearing on December 18, 2013, the parents submitted

2

on the Department's report, which relied on Dr. Lee's psychological evaluations. The court found the allegations in the petition true, ordered dependency for E.N., and ordered removal from the home. Family reunification services were ordered for both parents, with separate twice-weekly supervised visits for one hour at a time. Father's service plan included individual and couples counseling, participation in a domestic violence support group, and refresher courses in domestic violence prevention and stress management techniques.

In March, 2014, the Department recommended an amended case plan that added domestic violence prevention classes, mental health services, and participation in the Parent Education Group (PEG) for each parent.

In May, 2014, the social worker requested a temporary restraining order (TRO) against Father based on comments made to her by the mother. In her request, the social worker said that Father and mother argued at a visit, and when she told them to stop and focus on the visit, Father became angry and "made loud breathing sounds during the balance of the visit." The mother later told the social worker that Father had been researching the social worker on the internet and said he wanted to bomb the child protective service (CPS) building and get a sniper to start picking people off. The social worker concluded that "[t]he father is becoming obsessive about the Department and the social worker and spends much of his time blaming the Department and trying to find a way to ruin the social worker's career." She called police who made a report and said she was afraid for her safety. Father denied the allegations in the application for the TRO.

The court issued the TRO on May 6, 2014 with a peaceful contact provision so that Father could continue visitation. Father was subsequently arrested on May 13, 2014 for violating the restraining order.

In the status review report filed on May 29, 2014, the social worker recommended termination of services for the mother and Father.

3

The social worker stated that Father's participation in his case plan was insufficient and he had not made sufficient progress to recommend more services. She also stated in the report that E.N. had been placed in a concurrent home where her life was stable.

The contested six-month review hearing was held on August 26, 2014. Father agreed to submit on the social worker's reports as long as the visitation order of supervised, once weekly two-hour visits with E.N. remained in place. The court adopted the social worker's recommendations, and reunification services were terminated for Father, with continuing weekly supervised visitation.

On November 25, 2014, Father requested resumption of reunification services pursuant to section 388 based on his continued progress on the case plan. Consideration of the section 388 petition was set for the same time as the 12-month review hearing. The hearing was scheduled for February 9, 2015.

The 12-month review report stated that Father continued to participate in supervised visits with E.N. once a week for two hours and that his visits were consistent and appropriate. The social worker stated that she believed it was in E.N.'s best interest to remain connected to Father, and that it was clear that Father loved his daughter. Father had requested that visits with E.N. continue on at least a monthly basis. The report also noted that Father had a pending criminal case associated with the alleged restraining order violation that had occurred six months prior.

Regarding Father's section 388 petition, the court found that Father had not presented sufficient evidence of a prima face case that his circumstances had changed such that reunification services should be reinstated. The court denied the petition.

The matter was set for a selection and implementation hearing on June 9, 2015. On April 30, 2015, Father filed a letter with the court. In it, Father stated that he had done everything that he had been required to for his case plan. Father also stated that the

4

social worker had abused her position and lied to the court. He stated that none of the facts of the case was true, other than that he lost his temper upon finding out that E.N. was going to be born a drug addict because of the mother's use of drugs while she was pregnant. He claimed that the social worker had made unwanted sexual advances toward him, and that after he declined her advances, she turned her rejection into a mission to deny him his daughter. Father stated he would continue to fight for what was best for E.N. no matter what the outcome was of the hearing. Father asked that the court adopt guardianship as the permanent plan for E.N.

The Department prepared a section 366.26 report recommending that the court continue the dependency of E.N., declare that adoption was the appropriate permanent plan for her, and terminate the parental rights of both parents.

The report noted that E.N. was doing well in her concurrent home, and that the foster parents were very attached to her and very committed to adopting her. In a letter attached to the report, the foster parents expressed their love for E.N., and their openness to her continued visitation with the mother and Father if the visits continued to be in E.N.'s best interest.

At the contested section 366.26 hearing on August 31, 2015, the social worker testified that Father had supervised visitation with E.N. one hour per month. The social worker also testified that E.N. had been in the care of her foster parents since her birth, having been placed with them immediately upon discharge from the hospital. She testified E.N. is now almost two years old. She also stated that the foster parents were concerned about E.N.'s well-being following visits with Father, because she was much clingier and more anxious when she would visit with him. The foster parents told the social worker that it usually took E.N. a day to get back to normal following visits with Father.

Father testified that he was never given custody of E.N. and that his only contact with her was through supervised visitation. He testified his first visits were an hour each month, but gradually increased to once a week for two hours supervised. He testified he had never missed a single visit with E.N. or been late for a visit. Father stated that he had applied techniques learned in his classes. He testified that he brought toys and books to the visits and that he felt extremely bonded to E.N.

On cross-examination, Father testified that the reports of him being hostile and aggressive at the hospital were not true. When asked if he was aware that there were felony charges pending against him of making criminal threats, assault likely to produce great bodily harm and infliction of injury on a spouse stemming from that incident, his attorney objected that he had a Fifth Amendment right not to incriminate himself.

After hearing arguments, the court found that the visits between Father and E.N. had gone well, but the visits had not demonstrated a significant bond between them to prevent an adoption in this matter. The court found that Father had not presented enough evidence to show that he occupied a parental role in E.N.'s life, and that fun, caring visits between him and E.N. was not enough. The court concluded that there was no compelling reason for determining that termination of Father's parental rights would be detrimental to E.N. The court found that Father had not established that the beneficial parent/child relationship exception to adoption applied in this case. The court selected adoption as the permanent plan and terminated both parents' parental rights.

Father filed a timely notice of appeal in this court.

## DISCUSSION

Once a dependency case has proceeded to the point of a section 366.26 hearing, a juvenile court has limited choices. If the court determines by clear and convincing evidence that it is likely that the child will be adopted, the court is required to terminate parental rights and order the dependent child placed for adoption unless a statutory

6

exception applies. (§ 366.26, subd. (c)(1).) "The Legislature has thus determined that, where possible, adoption is the first choice." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] . . . The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*)

Section 366.26, subdivision (c)(1)(B), contains a number of exceptions to adoption, including the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)). That exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child [because] [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) A parent bears the burden of proving the beneficial parent-child relationship exception applies. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 207.) The parent-child relationship must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) "[T]he exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained

7

during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

On appeal from a court order terminating parental rights following the court's determination that the beneficial parent-child relationship exception does not apply, we review the juvenile court's findings of fact under a substantial evidence standard and its discretionary decision regarding the existence of a compelling reason under an abuse of discretion standard. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) "Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination." (*Id.* at p. 1314.)

In contrast, a juvenile court's determination whether there is a compelling reason not to terminate parental rights based on a beneficial parent-child relationship is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*In re Bailey J., supra*, 189 Cal.App.4th at p. 1315; see *In re C.B.* (2010) 190 Cal.App.4th 102, 123.) " ' ["]The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "When applying the deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed

8

de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citations]" (*In re C.B., supra*, 190 Cal.App.4th 102, 123.)

Here, Father fails to show that the court abused its discretion in determining that his relationship with E.N. did not promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) In evaluating whether the beneficial parent-child relationship exception applied, the court based its discretion on the fact that E.N. had been with her foster parents since she was released from the hospital following her birth. The court noted that although visits between Father and E.N. had gone well, Father had not established that he and E.N. had developed a close and loving relationship that would outweigh the benefit of adoption. The court also found that Father did not occupy a parental role for E.N. The court ultimately made clear that it could not find that the father-child relationship was so good and beneficial to E.N. that it would be in E.N.'s best interest to have that legal relationship continue rather than proceed with adoption.

Father fails to show that the juvenile court acted arbitrarily and beyond the bounds of reason in finding that the beneficial parent/child relationship exception to adoption was inapplicable.

### DISPOSITION

The order is affirmed.

_____

RUSHING, P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.